2004 WY 163

**DEV–TECH CORPORATION, a dissolved Florida corporation; and Euronote International Management, Ltd., a corporation formed under the laws of Gibraltar, Appellants (Defendants),**

v.

**WILSON, MILLER, BARTON & PEEK, INC., a Florida corporation; and Don Brown, Appellees (Plaintiffs).**

No. 03–184.

Supreme Court of Wyoming.

Dec. 10, 2004.*

---

* Final decision of the court rendered on September 9, 2004.

Representing Appellant Euronote International Management, LTD: Joseph F. Moore,

Jr., Glenn W. Myers, and Abigail S. Moore of Moore, Myers & Garland, LLC, Jackson, WY. Argument by Mr. Moore.

Representing Appellees: W. Keith Goody, Jackson, WY. Argument by Mr. Goody.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] This is an appeal challenging the district court's judgment concerning real property in Teton County, Wyoming. The district court ordered that a conveyance from Dev–Tech Corporation (Dev–Tech) to Euronote International Management, Ltd. (Euronote) be set aside and annulled so that the appellees could proceed with their execution. Specifically, the district court found that an option to transfer the Teton County property was not exercised in 1995, thus the property transfer from Dev–Tech to Euronote represented by a 1998 deed was a fraudulent conveyance. After reviewing the record, we hold that the district court's findings were not clearly erroneous and affirm.

## ISSUES

[¶ 2] Euronote presents the following issues:

A. The court erred in concluding that Dev–Tech made a fraudulent conveyance to Euronote when the essential elements of a fraudulent conveyance were not included in the court's findings or supported by clear and convincing evidence.

B. The court erred in failing to find the existence of a constructive and resulting trust on the part of Dev–Tech in favor of Euronote as the result of the exercise and substantial performance of the Dev–Tech unwind transaction.

C. Bare legal title under Wyoming law is not subject to lien.

D. The court erred in finding that Appellees' actions in Wyoming were adequate to establish an interest in the subject real property superior to that of Euronote.

Appellees Wilson, Miller, Barton & Peek, Inc. (Wilson Miller) and Don Brown state the issues as:

I. Did Dev–Tech ever exercise the option in a timely fashion to exchange property for the Dev–Tech stock owned by Euronote?

II. Was the transfer of the Wyoming property from Dev–Tech to Euronote in 1998 a fraudulent transfer?

III. Are the appellees barred from executing on the Wyoming property due to the amendment of W.S. § 1–17–336?

## FACTS

[¶ 3] Dev–Tech is a dissolved Florida corporation. Prior to dissolving, Dev–Tech was a publicly traded company focusing its business mainly on real estate development. Euronote is a Gibraltar entity and is a subsidiary of a British company, OEM. In September of 1993, Euronote and Dev–Tech entered into a Capital Stock Purchase Agreement. Under this agreement, Euronote transferred property known as the Trails End Ranch located in Teton County, real estate located in Florida, substantial receivables, and cash to Dev–Tech in exchange for Dev–Tech stock and various stock options and rights. This arrangement resulted in Euronote becoming approximately a 70% owner of Dev–Tech.

[¶ 4] However, after the 1993 agreement was executed and performed, problems arose because Euronote decided that some of Dev–Tech's business practices were not compatible with Euronote's business practices. These business practices mostly concerned related party or insider transactions. Under the law applicable to Euronote, Euronote was required to secure the consent of all of its shareholders for each of the Dev–Tech related party transactions, a step Euronote and its representatives on the Dev–Tech board were unwilling to undertake.

[¶ 5] Thereafter the parties sought to resolve these problems. Eventually, on February 24, 1995, the parties, along with a Florida limited partnership, DT Partners, Ltd., entered into a new Capital Stock Purchase Agreement. Among other things, the provisions of the 1995 agreement basically allowed Euronote to be replaced as the Dev–Tech majority stockholder. To effect such a

change, the 1995 agreement included an option-put provision whereby either Dev–Tech or Euronote could essentially elect to unwind the 1993 transaction by re-exchanging approximately the real estate assets and stock that were exchanged in 1993. The 1995 option-put provision read:

2.1 *Option to Acquire Euronote Common Shares and Euronote Preferred Shares.* Euronote hereby grants to Dev–Tech the option (the "Euronote Option") to purchase and redeem the Euronote Common Shares and the Euronote Preferred Shares from Euronote (with regard to the latter, in the form of Euronote's waiver of all of its rights and interests in and to the Euronote Preferred Shares) on the terms and conditions set forth herein. Similarly, Dev–Tech grants to Euronote the right to "put" the Euronote Common Shares and the Euronote Preferred Shares to Dev–Tech on the terms and conditions set forth herein (the "Euronote Put"). The Euronote Option shall be immediately exercisable, in whole, not in part, and the Euronote Put shall be exercisable, in whole, not in part, at any time after the date eight months from the Initial Closing Date and each of the put and the option shall terminate thirty days after the Euronote Put first becomes exercisable. The exercise price of the Euronote Option shall be paid by Dev–Tech transferring all of its right, title and interest in and to the following property to Euronote in exchange for the Euronote Common and the Euronote Preferred Shares. Conversely, if the Euronote Put is exercised, Euronote shall transfer to Dev–Tech the Euronote Common Shares and the Euronote Preferred Shares in exchange for the transfer of the following property from Dev–Tech to Euronote[.]

Various properties were then listed including the Trails End Ranch property. The 1995 agreement also stated, "The Initial Closing Date shall occur on January 26, 1995, or at such other time and location as may be agreed to by the parties."

[¶ 6] On April 11, 1996, Wilson Miller filed a civil action in Florida against an individual and an entity controlled by William Klohn, a Dev–Tech officer and director.

Dev–Tech was added as a defendant in that action on May 5, 1997. On June 22, 1998, this action resulted in Wilson Miller's judgment against Dev–Tech. Wilson Miller domesticated its foreign judgment in Teton County on September 2, 1998. At that time Dev–Tech was the record owner of the Trails End Ranch.

[¶ 7] Mr. Brown, a former Dev–Tech director, filed suit against Dev–Tech in Florida on October 30, 1998. That suit resulted in Mr. Brown's judgment against Dev–Tech entered on February 8, 1999. Mr. Brown domesticated his foreign judgment in Teton County on March 10, 1999. At that time Dev–Tech was the record owner of the Trials End Ranch. On June 6, 2000, two documents titled "Judgment Liens" were recorded in the Teton County land records on behalf of Wilson Miller and Mr. Brown. On August 9, 2000, a deed conveying the Trails End Ranch property from Dev–Tech to Euronote (the Euronote deed) was recorded in the Teton County land records.

[¶ 8] Prior to the August 9, 2000 recording of the Euronote deed, the appellees had arranged to have the Trails End Ranch property appraised for execution. On the day that the appraisal was complete, August 10, 2000, the appraiser discovered that the Euronote deed had been filed. The deed was purportedly executed in England on November 26, 1998. Brian Schneider, a Euronote agent and a former Dev–Tech director, signed the deed for Dev–Tech.

[¶ 9] Appellees thereafter filed this action to set aside that transfer as a fraudulent conveyance. Euronote responded with several defenses; the main defense was that in 1995 Dev–Tech had exercised the option contained in the 1995 stock agreement. As a result, Euronote argued that it owned the property in 1995, but due to an oversight, the deed was not prepared or recorded at that time. Thus, Euronote maintained that there was not a fraudulent conveyance because the property had actually been transferred in 1995. Whether or not the option had been exercised became the main issue at trial.

[¶ 10] Appellees argued that the option was never exercised and presented several witnesses on the matter. One of those wit-

nesses, William Klohn, a former Dev–Tech director, testified that his recollection was that the option was not exercised. Also testifying was Gerald H. Gould, the chairman of the board of directors. He testified that it was his duty to conduct board meetings and that it was his opinion or remembrance that the option was never exercised. Mr. Brown was also on the Dev–Tech board of directors during the relevant time and similarly testified that the option was not exercised. He noted that the Wyoming property was one of Dev–Tech's largest assets and that it would not be wise to let it out of the company.

[¶ 11] Euronote presented evidence that the option had been exercised. Specifically, Euronote called Mr. Schneider to testify and also presented several documents. Mr. Schneider testified and stated that the option was exercised on November 29, 1995. The documents Euronote presented included the minutes of the November 30, 1995 board of directors meeting. Under the heading "New Developments," the minutes state that Dev–Tech sent a letter to Euronote exercising its option to redeem its shares. The minutes are unsigned although there is a signature line for Mr. Gould as chairman. Mr. Gould testified that he was at that meeting but that he has no recollection of the option being exercised. Euronote also presented several SEC filings that state either that the option was going to be exercised or that the option was exercised and set out the history and results of the transaction. The SEC documents indicate that the Euronote option was exercisable by Dev–Tech at any time until December 9, 1995, and was exercisable by Euronote from November 9, 1995 until December 9, 1995. Euronote also presented a letter signed by Dev–Tech's executive vice president and chief operating officer dated November 29, 1995, notifying Euronote that Dev–Tech was exercising the option, but also stating "[p]lease call me to effect this transaction immediately."

[¶ 12] Following a bench trial, the district court found that the option was never exercised and, even if it was exercised, it had expired by its own terms, and any attempt to exercise it was not effective. The district court additionally found that, on the dates

Dev–Tech became liable to the appellees, it was either the owner in fee simple or the record owner of the Trails End Ranch property. The court also found that at the time of the transfer Dev–Tech was insolvent. Thus, the district court concluded that the transfer of the Trails End Ranch to Euronote was a fraudulent transfer. Euronote appeals.

### STANDARD OF REVIEW

[¶ 13] We review a trial court's factual determinations made in a bench trial under a clearly erroneous standard. *Keever v. Payless Auto Sales, Inc.,* 2003 WY 147, ¶ 6, 79 P.3d 496, ¶ 6 (Wyo.2003). We do not weigh the evidence de novo. *Id.* Indeed,

> [w]e do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. *Life Care Centers of America, Inc. v. Dexter,* 2003 WY 38, ¶ 7, 65 P.3d 385, ¶ 7 (Wyo.2003). We affirm the trial court's findings if there is any evidence to support them. *Id.* We accept the evidence of the prevailing party as true and give that party the benefit of all favorable inferences that can fairly be drawn from the evidence while disregarding conflicting evidence. *Narans v. Paulsen,* 803 P.2d 358, 360 (Wyo.1990). A reviewing court will not set aside the court's findings merely because it might have reached a different result. *Conner v. Board of County Comissioners, Natrona County,* 2002 WY 148, ¶ 23, 54 P.3d 1274, ¶ 23 (Wyo.2002). A finding can be "clearly erroneous" even though there is evidence to support it, if after a review of the entire record, the court "is left with the definite and firm conviction that a mistake has been committed." *Hammons v. Table Mountain Ranches Owners Association, Inc.,* 2003 WY 85, ¶ 12, 72 P.3d 1153, ¶ 12 (Wyo.2003).

*Keever,* ¶ 7.

### DISCUSSION

[¶ 14] The resolution of the majority of the issues raised by the parties hinges on our determination of whether the district

court's finding that the option was not exercised is clearly erroneous. As noted in our standard of review, we affirm the court's findings if there is any evidence to support them. Such is the case with the district court's finding that the option was never exercised. Indeed, the evidence is such that we cannot say that the district court's decision is clearly erroneous, and we are not left with the definite and firm conviction that a mistake was committed. *Keever,* ¶ 7.

[¶ 15] Specifically, appellees presented Mr. Klohn, Mr. Gould, and Mr. Brown who all testified that the option was not exercised. Mr. Klohn specifically recalled the November 30, 1995 board meeting. He remembered particular things that were discussed at that meeting, including current projects, but he specifically stated that he did not recall discussing the Euronote option or that it was ever exercised. He further testified that it would make no sense for Dev–Tech to exercise the option. He also noted that, to his knowledge in the day-to-day operation of the company following that board meeting, the Euronote option was never exercised. He noted that Dev–Tech's single largest asset was the Wyoming property. He stated that from his perspective, no matter what was going on in the company, it would not have made good sense to allow some of the company's most important assets to leave the company at that time.

[¶ 16] Mr. Brown, one of the plaintiffs, sat on the board of directors during the relevant time frame and also testified that the option was never exercised. Mr. Gould was the chairman of the board and similarly testified. He testified that he had no recollection that the option was ever exercised. He further did not sign the minutes of the meeting wherein it was noted that the option was exercised.

[¶ 17] As noted in the fact section, Euronote presented contrary evidence. Nevertheless, that evidence was not uncontested. For instance, appellees' evidence showed that other property transactions similar to the option transaction were accomplished and recorded in a more formal manner rather than simply noted in the minutes of a board meeting as "other developments." Additionally, if the option were exercised, one would expect the deed to be transferred as is normal in a real property transaction and specifically required by the stock agreement. Furthermore, notably absent from evidence were the other documents which the 1995 agreement specifically required be exchanged upon the exercise of the option. Those documents include: the stock certificates for the Euronote common shares, duly endorsed; the written resignation of all but one of the Euronote nominees to the Dev–Tech board of directors; Euronote's written waiver of its right to nominate additional members to the board of directors; an irrevocable waiver of Euronote's rights under Dev–Tech's bylaws which required the approval of a majority of Euronote's nominees to the Dev–Tech board of directors for all corporate action; an amendment to Dev–Tech's bylaws deleting that provision; an assumption agreement evidencing Euronote's agreement to assume liability for the debts, liens, judgments or other encumbrances on the Wyoming Properties; a written waiver or disclaimer of any and all interest in and to the shares of Dev–Tech common stock which Euronote contracted to purchase from Dev–Tech; a certificate of title in Euronote's name, evidencing the limited partnership interest in Trade Center that Dev–Tech was transferring to Euronote; and the warranty deeds or other instruments of conveyance selling, transferring or assigning the Wyoming properties to Euronote.

[¶ 18] It is the district court's duty to weigh and reconcile the conflicting evidence. We will not do so on appeal. Additionally, we will not set aside the court's findings simply because we might have reached a different result. *Keever,* ¶ 7. While there was in fact evidence in Euronote's favor, after reviewing the entire record we find enough evidence to support the district court's finding that the option was not exercised; and we cannot, therefore, conclude that the finding is clearly erroneous.

[¶ 19] The court's specific finding was that the option was not exercised and, even if the option was exercised, the option expired by its own terms and any attempt to exercise the option is not effective. Euronote therefore additionally presents argument that the

evidence showed that the option had not expired before it was exercised and that, even if it had expired, the parties to a contract are free to modify the terms at any time and agree to a later date. Because the district court found that the option was not exercised and we have decided that this finding was not clearly erroneous, we need not address this argument because that finding is ultimately determinative.

[¶ 20] Likewise, Euronote argues that the court failed to find the elements of a fraudulent conveyance. However, most of Euronote's argument is based on its contention that the option was exercised in 1995. For example, Euronote argues in its brief that neither Dev–Tech nor Euronote had fraudulent intent when the obligation for Dev–Tech to convey the subject property to Euronote arose in 1995. However, we have determined that the district court's finding that the option was not exercised is not clearly erroneous. This determination negates most of Euronote's argument.

[¶ 21] Furthermore, in harmony with its finding that the option was not exercised, the district court found that on the date that Dev–Tech became liable to the plaintiffs it was the record owner or the owner in fee simple of the Trails End Ranch. The district court similarly found that Dev–Tech was insolvent in 1998 when Dev–Tech presumably transferred the property to Euronote and that the transfer was made without consideration. It appears that, in making such findings, the district court considered the elements of Wyo. Stat. Ann. § 34–14–105 (LexisNexis 2003), which states: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

[¶ 22] Dev–Tech was administratively dissolved on May 30, 1997, for failure to file its annual report and had ceased to operate. As such, it was perfectly logical for the district court to find that Dev–Tech was insolvent in 1998, and such a finding is not clearly erroneous. Indeed, the financial information Euronote presented related not to 1998 but to Dev–Tech's finances in 1995. Likewise, Euronote claims that the Dev–Tech stock to be returned to Dev–Tech was the consideration for the transaction. Once again, that claim is based on Euronote's contention that the option had been exercised. The district court found, and we have determined that such a finding was not clearly erroneous, that the option had not been exercised. This leads to the conclusion that, at the earliest, the conveyance occurred in 1998. At that time Dev–Tech had been dissolved, and there was no evidence that anything was exchanged in 1998. Consequently, the finding that the transfer was without consideration is likewise not clearly erroneous.

[¶ 23] Euronote also argues that the court erred in not addressing its constructive and resulting trust arguments and that a party cannot execute on bare legal title. As with its other arguments, this argument is based on its assertion that the option was exercised. The district court, which found that the unwind transaction did not take place, did not err in not addressing the argument. As Euronote claims, we have approved the imposition of constructive and resulting trusts, but only in proper circumstances. *Rossel v. Miller*, 2001 WY 60, ¶ 14, 26 P.3d 1025, ¶ 14 (Wyo.2001). Those circumstances include an indication of one or more of the following: some type of promise, a transfer made in reliance on that promise, and unjust enrichment. *Id.* at ¶ 13. Having found that the option was never exercised, these elements are missing.

[¶ 24] Lastly, Euronote argues that the appellees' judgment lien was void before the Euronote deed was recorded; therefore, appellees' actions were insufficient to give them an interest superior to that of Euronote. It appears Euronote is claiming that, because the appellees failed to comply with the limitation period set forth in Wyo. Stat. Ann. § 1–17–336 (LexisNexis 2003), they cannot execute on the Trails End Ranch. We do not agree. This case does not present merely a question of priority between the two competing parties. Rather, this case involved the determination that the Euronote deed was a fraudulent conveyance. Therefore, it was not simply the appellees "judgment lien" that

presented the superior interest, but also that the Euronote deed was a fraudulent conveyance.

[¶ 25] Furthermore, § 1–17–336 provides that: "A judgment on which execution is not levied before the expiration of one (1) year after its rendition shall not operate as a lien on the estate of a debtor."[1] As can be seen by the plain language, this statute addresses the time in which a filed judgment operates as a lien. Section 1–17–336 does not state that the judgment creditor's rights to execute on the debtor's property expire. Instead, it states that, if there is no execution within a year, the judgment ceases to operate as a lien. This may affect priority, but it does not affect the property available for execution. Wyo. Stat. Ann. § 1–17–301 governs the property available for execution, and it states: "Except for property exempt by law, all property of the judgment debtor, both real and personal or any legal or equitable interest therein including any interest of the judgment debtor in mortgaged property or property being sold under an executory land contract, is subject to execution." As such, even if their lien had expired, the appellees could still execute on the Trails End Ranch.

## CONCLUSION

[¶ 26] As fully discussed above, we affirm the district court's order.

---

1. The parties argue about whether the 1999 version of the statute applies. Regardless of which version applies, neither version prevents appellees from executing on the property.